IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:24-cv-00478-CNS-SBP

NUTRITIONAL THERAPY ASSOCIATION, Inc., a Washington corporation,

    Plaintiff,

v.

RITHMIC WELLNESS, LLC, a Colorado limited liability company d/b/a ROBO WELLNESS;
MICHAEL REPSHER, an individual; and
DEBORAH ELVIN, an individual,

    Defendants.

## ORDER

This matter comes before the Court on Plaintiff's Motion for Temporary Restraining Order or, in the Alternative, Temporary Injunction. ECF No. 4. For the reasons explained below, the motion is DENIED.

### I. BACKGROUND

Plaintiff Nutritional Therapy Association, Inc. (Nutritional Therapy or NTA) filed its lawsuit against Defendant Rithmic Wellness LLC (Robo Wellness) and its owners, Defendants Michael Repsher and Deborah Elvin. ECF No. 1 (Redacted Compl.); ECF No. 3 (Unredacted Compl.). Nutritional Therapy alleges five claims for relief: (1) breach of contract; (2) Colorado Deceptive Trade Practices Act[1]; (3) violation of the Trade

---

[1] Plaintiff asserts its Colorado Deceptive Trade Practice Act (Count Two) against all Defendants. The other four counts are asserted against Robo Wellness only.

1

Secrets Act, 18 U.S.C. § 1836, et seq.; (4) violation of the Colorado Uniform Trade Secrets Act C.R.S. § 7-74-101, et seq.; and (5) unjust enrichment. ECF No. 1, ¶¶ 92–145.

Nutritional Therapy, founded in 1997, is a family-owned membership organization and school providing foundational holistic nutrition education. ECF No. 4 at 3. Nutritional Therapy's graduates apply their training to launch private practices; work alongside doctors, naturopaths, chiropractors, holistic practitioners; and develop corporate wellness programs, among others. *Id.*

In 2001, Nutritional Therapy created the Nutritional Assessment Questionnaire (NAQ). *Id.* at 3–4. Nutritional Therapy eventually packaged the NAQ with additional tools and resources within a broader proprietary program named "Nutri-Q." *Id.* at 4. By 2008, after teaching students in a classroom settings for years, Nutritional Therapy migrated Nutri-Q to a web-based platform, providing access to practitioners on the go. *Id.* For an annual subscription fee, customers could access the Nutri-Q program through Nutritional Therapy's website. *Id.*

In 2018, Nutritional Therapy wanted to improve the functionality of Nutri-Q, and to do so, it needed to change its outdated website-hosting platform. *Id.* at 5. To that end, Nutritional Therapy began talks with Michael Repsher and Deborah Elvin, owners and operators of Robo Wellness. *Id.* Repsher and Elvin are software developers. *Id.* Elvin also is a graduate of Nutritional Therapy's practitioner program. *Id.*

In December 2018, Nutritional Therapy and Robo Wellness entered into a Software Development, License and Hosting Agreement (the License Agreement). ECF No. 4 at 5; ECF No. 5-1 (License Agreement dated December 7, 2018). According to

Nutritional Therapy, Nutritional Therapy hired Robo Wellness to host the Nutri-Q website and improve the capabilities of the cloud-based Nutri-Q platform using Robo Wellness's software-as-a-service (SaaS) platform to build specific improvements to the Nutri-Q program (known as Customizations). ECF No. 4 at 5. These services were collectively referred to as "Nutri-Q by NTA powered by Robo Wellness." *Id.*[2]

In exchange for hosting Nutri-Q and building Customizations for the program, the parties agreed that Robo Wellness would receive one-half of all subscription revenue for the Nutri-Q service. *Id.* at 7.

The parties agree that the License Agreement contained an automatic one-year renewal unless either party provided written notice of termination at least three months in advance of the last day of the term. *Id.* After termination, the parties further agreed that Robo Wellness would provide an additional 90 days of hosting services, deliver the Nutritional Therapy Customizations in a mutually agreed upon format, and assist Nutritional Therapy with reasonable requests it may have during the 90-day transition period. *Id.* The parties further agreed that each party would retain its intellectual-property rights, and all licenses would terminate. *Id.*

Unhappy with the terms of the License Agreement, Nutritional Therapy attempted to renegotiate the terms in April 2022. *Id.* at 8. It also attempted to buy Robo Wellness for

---

[2] Robo Wellness characterizes the agreement to host Nutri-Q as a "Combined Platform." ECF No. 30 at 5. In fact, it refers to the "Combined Platform" over 40 times in its response. The License Agreement generally supports this characterization. *See* License Agreement at 1 ("NTA is interested in collaborating with Robo Wellness to license the Robo Wellness SaaS Platform and the Robo Wellness IP Rights, with certain modifications to integrate the NTA Software into the Robo Wellness SaaS Platform, in order to market a software as a service platform (the 'Nutri-Q by NTC powered by Robo Wellness' or 'Service') to NTA graduates and other nutritional therapy practitioners ('Users')."). Nutritional Therapy does not address this characterization in its reply.

3

$100,000 and hire Repsher and Elvin as employees. *Id.*; ECF No. 30 at 6. Robo Wellness rejected Nutritional Therapy's proposals. ECF No. 4 at 8. Nutritional Therapy thus notified Robo Wellness that it planned to terminate the License Agreement on December 31, 2023. *Id.* at 9. According to the parties, the transition period would extend through March 7, 2024. *Id.*

Nutritional Therapy filed its lawsuit on February 20, 2024, a few weeks before the transition period ended. Nutritional Therapy alleges that Robo Wellness failed to assist Nutritional Therapy in its transition to a new website provider. *Id.* at 9. It further alleges that Robo Wellness used Nutritional Therapy's proprietary algorithm, forms, and confidential information to build an imitation program that Robo Wellness called "Whole Practice." *Id.* Nutritional Therapy succinctly describes its core allegation as follows:

> The central premise of Nutritional Therapy's complaint is that Robo Wellness has used Nutritional Therapy's confidential, proprietary information to build a competing website, "Whole Practice," and is improperly competing with Nutritional Therapy by not providing Nutritional Therapy with the data needed to continue the Nutri-Q site and by making misleading statements to Nutri-Q users to induce them to move to Whole Practice.

ECF No. 34 at 3.

Robo Wellness denies these allegations for several reasons. In addition to denying that it used any trade secrets of Nutritional Therapy, Robo Wellness explains that the License Agreement is not a non-compete and is expressly "non-exclusive," ECF No. 30 at 7; License Agreement, ¶ 10 ("[T]his Agreement is non-exclusive."), so it had every right to launch Whole Practice.

4

In the instant motion, Nutritional Therapy seeks a temporary restraining order (TRO) against Robo Wellness. Although its motion is somewhat vague in its requests, Nutritional Therapy filed a proposed order (as it is required to do) asking the Court to order the following relief:

(1) Defendants are hereby ordered to immediately cease all solicitation of customers for the Whole Practice program or any other similar program. In accordance with this order, Defendants shall remove, and may not post or repost, any banner, announcement, statement, or other notice claiming or suggesting that the Nutri-Q program and website are terminating, closing, or otherwise ending.

(2) Defendants are hereby ordered to immediately stop accepting any new subscriptions or purchases of the Whole Practice program or any other similar program.

(3) Defendants shall immediately cease operation of the Whole Practice program. Defendants shall notify all existing Whole Practice subscribers that the Whole Practice program has been suspended by court order.

(4) Defendants shall immediately make [] available to Nutritional Therapy all information necessary to allow Nutritional Therapy to transition the website to a web-hosting service of its choice.

(5) Defendants shall not use, copy, disseminate, or otherwise misappropriate any trade secrets, proprietary information, or other "Confidential Information," as defined by the License Agreement, for any purpose other than the continued operation and expeditious transfer of the Nutri-Q website or other Nutritional Therapy website.

(6) The Court concludes that, based upon the evidence presented and circumstances of the case, no bond is necessary or appropriate. And

(7) Defendants shall comply with this order immediately upon its entry. This Order shall remain in effect until further order of this Court.

ECF No. 4-1 (Proposed Order) at 6–7.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes courts to enter preliminary injunctions and issue TROs. Fed. R. Civ. P. 65(a), (b). The decision whether to issue a TRO is committed to the court's sound discretion. *Allen W. Hinkel Dry Goods Co. v. Wichison Indus. Gas Co.*, 64 F.2d 881, 884 (10th Cir. 1933); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2951 (3d ed. 2023) ("The issuance of a temporary restraining order is a matter that lies within the discretion of the district court."). The procedure and standards for determining whether to issue a TRO mirror those for a preliminary injunction. *See Emmis Commc'ns Corp. v. Media Strategies, Inc.*, No. CIV. A. 00-WY-2507CB, 2001 WL 111229, at *2 (D. Colo. Jan. 23, 2001) (citation omitted).

A party seeking preliminary injunctive relief must satisfy four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). A party seeking an injunction must demonstrate that "all four of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear

and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

The Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford all the relief that the movant could expect to win at trial. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2004). A request for disfavored injunctive relief "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). Accordingly, where a movant requests a disfavored injunction, the movant "must make a strong showing both on the likelihood of success on the merits and on the balance of the harms." *Colo. v. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (quotation omitted).

### III.  ANALYSIS

The Court has reviewed Nutritional Therapy's motion and reply, Robo Wellness's response, and the various exhibits and affidavits attached to the parties' briefings. ECF Nos. 4–6, 30, and 34. The Court considers the four factors governing a TRO below and concludes that Nutritional Therapy has failed to meet its burden of showing that a TRO is warranted.

### A.  Likelihood of Success on the Merits

Before a court may issue a preliminary injunction, the movant must establish a substantial likelihood of prevailing on the merits of its claims. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). However, "the determination of

a motion for a preliminary injunction and a decision on the merits are different." *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980)). A plaintiff generally need only "establish a reasonable probability of success, not an overwhelming likelihood of success.'" *Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) (citation and quotations omitted). But where, as here, a plaintiff attempts to alter the status quo, a plaintiff must make a "strong showing" with respect to the likelihood of success on the merits. *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (GM sought to alter the status quo by halting production of Urban Gorilla products).

Here, Nutritional Therapy requests relief that would alter the status quo rather than preserve it and also would require Robo Wellness to engage in affirmative (mandatory) actions. For these reasons, the Court finds that Nutritional Therapy's requested injunctive relief "constitutes a specifically disfavored injunction" that "must be more closely scrutinized." *See Schrier,* 427 F.3d at 1259, 1261.

Nutritional Therapy argues that it has a substantial likelihood of success on each of its claims. ECF No. 4 at 15–26. The Court disagrees. On its breach of contract claim, for example, Nutritional Therapy argues that Robo Wellness has not fulfilled its transition obligations under Section 5 of the License Agreement by failing to provide Nutritional Therapy with all Customizations made to Nutri-Q and assist with reasonable requests to transition Nutri-Q to Nutritional Therapy's new hosting platform. *Id.* at 16. The evidence submitted by Robo Wellness suggests otherwise.

On October 3, 2023, in a lengthy email, Robo Wellness informed Nutritional Therapy that it would begin gathering and provide all forms, reports, data, and the

algorithm associated with the original NAQ, as well as the new version of the NAQ (V2), including all applicable improved forms and relevant data, as requested. ECF No. 30-6 (email from Repsher to Nutritional Therapy's CEO, Michael Belz). Repsher also states in his declaration that Robo Wellness "provided NTA with all the information, code, and materials referenced above on October 8, 2023," and the "[d]ownload receipts confirm that NTA received the materials." ECF No. 30-1 (Repsher Declaration), ¶ 42. Nutritional Therapy does not address these points in its reply.

By way of another example, Nutritional Therapy vaguely asserts that Robo Wellness is engaging in "deceptive practices" to lure away Nutritional Therapy customers.[3] Nutritional Therapy says Robo Wellness falsely informed customers that the website was shutting down instead of telling customers that the site would be transferred to a different, unnamed web host. ECF No. 4 at 18. But the evidence reveals that, by way of Nutritional Therapy's termination, the Combined Platform *was* shutting down at the conclusion of the transition period. Repsher Declaration, ¶ 39 ("As [Robo Wellness] understand the Agreement, [termination of the Services] requires the complete shutdown of the Combined Platform, with each party being permitted to attempt to build its own replacement using their own IP.").

And finally, Nutritional Therapy charges Robo Wellness with using the Nutri-Q algorithm and other Nutritional Therapy confidential information to build Whole Practice, which it claims is an "imitation product." ECF No. 4 at 16–18. The only *argument*

---

[3] In its reply, Nutritional Therapy claims that "Robo Wellness admits that it is relying on deceptive language to take subscribers away from Nutritional Therapy." ECF No. 34 at 3. If true, the Court would expect some citation to the record to support such a bold assertion. But Nutritional Therapy failed to provide one.

Nutritional Therapy offers is that "various aspects of Whole Practice are lifted verbatim from materials shared with Robo Wellness for the Nutri-Q program . . . [and it] also used confidential subscriber information to solicit existing Nutri-Q subscribers to use Whole Practice instead." ECF No. 4 at 16. Nutritional Therapy offers little support for these assertions. *See also* ECF No. 5 (Declaration of Mallory Acosta, Nutritional Therapy's Vice President of Academics), ¶ 33 (without support, stating that "Whole Practice incorporates the knowledge, research, resources, and insights that Nutritional Therapy shared with Robo Wellness since 2018, in breach of the License Agreement and Robo Wellness's now-terminated license to that information").

The evidence here is not enough to satisfy Nutritional Therapy's "strong showing" of likelihood of success on the merits. Robo Wellness has disclaimed under oath that it used any confidential or proprietary information of Nutritional Therapy to develop Whole Practice. Repsher Declaration, ¶ 87 ("[W]e are not and have not used any confidential or proprietary information of NTA in furtherance of anything other than the continued operation of the Combined Platform. Our Whole Practice program uses our proprietary Underlying Platform to operate and has a wellness questionnaire that was independently developed, without reliance on any confidential information of NTA, and as noted above, we used a different philosophy in creating our questionnaire. And when we contacted our users, we did so with information the users themselves provided us.").

The Court finds that Nutritional Therapy has failed to establish a substantial likelihood of prevailing on its substantive claims at trial, and therefore, this factor weighs against injunctive relief.[4]

### B.  Irreparable Harm

"Irreparable harm" means that the claimed injury "must be both certain and great"; it is not enough to be "merely serious or substantial." *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (citation omitted). Generally, a harm is not irreparable when the losses may be compensated by monetary damages. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). The movant must show that the "injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted) (emphasis in original); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (showing irreparable harm is "not an easy burden to fulfill").

Nutritional Therapy does little to show irreparable harm from Robo Wellness's alleged use of Nutri-Q. *See* ECF No 4 at 26–27. Robo Wellness, in contrast, points out that that there are no allegations that trade secrets are about to be disclosed and thus lost. ECF No. 30 at 16. Instead, Nutritional Therapy's claim is that Robo Wellness utilized the Nutritional Therapy's algorithm in Robo Wellness's already operating Whole Practice platform. *Id.* Robo Wellness responds by noting that, even if Robo Wellness had used Nutritional Therapy's algorithms in developing Whole Practice, customers do not see the

---

[4] Though not required, the Court will proceed with analyzing the other three factors out of abundance. *See Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x at 766 (holding that a plaintiff's failure to prove any one of the four factors renders preliminary relief unwarranted).

algorithms, thus eliminating the necessity of a restraining order. *Id.* And in terms of injury, if any, Nutritional Therapy can recover money damages if it proves its trade secret claims at trial. *See SGS Acquisition Co. Ltd. v. Linsley*, No. 16-CV-02486-CMA-KLM, 2019 WL 10529743, at *4 (D. Colo. Sept. 3, 2019) ("Colorado courts have recognized lost profits as a permissible measure of damages in trade secret cases."); *Benton v. Avedon Eng'g, Inc.*, No. 10-cv-01899-RBJ-KLM, 2012 WL 3399367, at *5 (D. Colo. Aug. 15, 2012) ("Courts have used a wide variety of methods to measure damages in trade secret cases, including lost profits, unjust enrichment and reasonable royalty. . . . In general, both lost profits and unjust enrichment theories have been widely accepted." (citation omitted)); *NxGen, LLC v. Dejonge*, No. 07-cv-00396-WYD-KLM, 2007 WL 2788607, at *3 (D. Colo. Sept. 20, 2007) ("The Colorado Uniform Trade Secrets Act permits recovery of both compensatory damages and lost profits attributable to the misappropriation." (citing C.R.S. § 7–74–104(1))). Nutritional Therapy offers no response to this argument in its reply.

Nutritional Therapy goes on to say that the injury is "compounded by Robo Wellness's refusal to comply with its transition obligations, which is hindering Nutritional Therapy from building a fully functioning new platform for Nutri-Q." *Id.* at 27. The Court, however, has already found that the evidence indicates that Robo Wellness is cooperating with its transition obligations.[5] And finally, it argues that Robo Wellness is

---

[5] Despite complaining that Robo Wellness is not cooperating in the transfer of data from the old platform to the new platform (assuming there is a new platform, which has not been established in record as of the filing of Nutritional Therapy's brief), *see, e.g.*, ECF No. 4 at 16 ("Robo Wellness refused to transfer the data for Nutritional Therapy to move Nutri-Q to a new hosting platform, making the transition impossible to complete as planned."), Nutritional Therapy concedes in its reply that "many of the exhibits submitted by Robo Wellness actually show Robo Wellness preparing to transfer the data to Nutritional Therapy." ECF

falsely informing Nutritional Therapy's customers that the Nutri-Q site will be shut down. *Id.* The Court has also determined that, on its face, a reasonable factfinder could determine that the site was, in fact, shutting down.

At bottom, Nutritional Therapy apparently asks the Court to presume this factor is satisfied because it invokes a claim under the federal and state Trade Secrets Act. The Court, however, is not permitted to make this presumption. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1143 (10th Cir. 2017) ("DTSA and CUTSA . . . merely authorize and do not mandate injunctive relief and thus do not allow a presumption of irreparable harm."). Although some courts under different circumstances have held that the threat of "loss of trade secrets" warrant injunctive relief, *see* ECF No. 4 at 26–27 (collecting cases), that is not the case here.

Nutritional Therapy has failed to show that any harm is both certain and great. This factor, like the last, weighs against injunctive relief.

### C.  Balance of Hardships

"To be entitled to a preliminary injunction, the movant has the burden of showing that 'the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction'." *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113 (D. Colo. 2021) (quoting *Heideman*, 348 F.3d at 1190).

Even reading Nutritional Therapy's motion liberally, the potential harm to it likely does not outweigh the potential injury to Robo Wellness should the Court grant the relief

---

No. 34 at 2. This concession suggests Robo Wellness is attempting to comply with its contractual obligations. And further, Robo Wellness states that it does not oppose Nutritional Therapy's launch of its own website, and it "intends to help with the transfer" of the data that it is required to transfer pursuant to the License Agreement. ECF No. 30 at 24. The Court takes Robo Wellness at its word.

requested. Nutritional Therapy asks this Court to "immediately cease operation of the Whole Practice program" and to "notify all existing Whole Practice subscribers that the Whole Practice program has been suspended by court order." Proposed Order at 6. Robo Wellness argues that such an order would be the "death knell" for it because, in the "health care field, trust is important, and to send a message that a service has been suspended by court order" would ruin the business. ECF No. 30 at 19 (citing Repsher Declaration, ¶ 91 ("[W]e operate in a privacy intensive field. Any statement that our offerings have been shutdown by Court order would cause significant harm, as it would undermine the public's confidence in our company and destroy all our hard-earned good will. Customers would likely be hesitant to provide private data to a company that the government specifically shutdown, even if only for a short period of time.")).

Moreover, Robo Wellness contends that any transfer of confidential user health data without consent could expose Robo Wellness to liability under HIPAA. ECF No. 30 at 20. Though minimal, Robo Wellness does provide support for this argument via an affidavit from its co-founder. Repsher Declaration, ¶ 41 ("NTA also shockingly requested that we provide all user data, including usernames, logins, emails, client forms, and health records, and that we provide it in an excel or database file. Exhibit Q. A request of this nature is unheard of in our industry, as such information should never be provided in an unencrypted manner, and certainly not without user consent. . . . The combined platform contains over 150+ million rows of highly sensitive data for over 235,000 individuals; not something that can or should ever be transmitted using Excel."); *see also* ECF No. 30-18

14

(Nutritional Therapy CEO email to Robo Wellness requesting several items including "client forms [and] health records").

In its reply, Nutritional Therapy says there is no support for the HIPPA concerns. ECF No. 34 at 5. But tellingly, Nutritional Therapy offers nothing but argument from its attorney. Without assurances of safeguards in place, the Court is not willing to order Robo Wellness to "immediately make [] available to Nutritional Therapy *all information necessary* to allow Nutritional Therapy to transition the website to a web-hosting service of its choice." Proposed Order at 7 (emphasis added).

Nutritional Therapy has not shown that the balance of harms favors granting the TRO. Factor three weight weighs against injunctive relief.

### D. Public Interest

Where a plaintiff fails to prove money damages would not suffice, "the public interest favors keeping a business in operation while allowing these private interests to be fought out on the merits." *See Postnet Int'l Franchise Corp. v. Wu*, 521 F. Supp. 3d 1087, 1105–06 (D. Colo. 2021).

Here, Nutritional Therapy asks the Court to order Robo Wellness to stop accepting any new subscriptions or purchases of the Whole Practice program. But these damages, if any, can be proved at trial. Through discovery, Nutritional Therapy will learn how many customers have subscribed to Whole Practice, when they subscribed, and the identity of those customers (under an appropriate protective order). Nutritional Therapy will then have the opportunity to show that Robo Wellness lured customers away from Nutritional Therapy's brand. Thus, because Nutritional Therapy has not shown that money damages

will not suffice, the public interest weighs against ordering Robo Wellness to "immediately cease operation of the Whole Practice program." *See Postnet Int'l Franchise Corp.*, 521 F. Supp. 3d at 1105–06.

## IV.  CONCLUSION

Consistent with the above analysis, Plaintiff's Motion for Temporary Restraining Order or, in the Alternative, Temporary Injunction, ECF No. 4,[6] is DENIED.

DATED this 12th day of March 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

---

[6] Because Nutritional Therapy filed its motion on a restricted basis, the public entry for the motion appears at ECF No. 9.